# CHEESWRIGHTS

SCRIVENER NOTARIES | LLP

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **Luis Neil HYDE-VAAMONDE**, of the City of London, England, **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY:

THE genuineness of the electronic signature affixed to page 27 of the document, a true and complete print copy of which is annexed hereto, as being that of **Ezequiel Mariano MANOVIL**, who had previously identified himself to this notarial office and whose identity I attest (hereinafter the "Signatory"), acting in his capacity as chairman of **THE GRAIN AND FEED TRADE ASSOCIATION**, a United Kingdom company duly organised and existing, registered with the Registrar of Companies for England and Wales under number 1006456,;

THAT on the day of the date hereof I conducted a video conference with the Signatory during which he acknowledged to me that he did electronically sign the said document in his said capacity for the uses and purposes therein set forth;

THAT under the law of England and Wales an electronic signature is capable of being used to execute a document and the electronic signature of the Signatory affixed to the annexed document is a valid signature in accordance with that law.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this second day of February in the year two thousand and twenty six.



Member Notariat of the International Union of Notaries (UINL)

Regulated through the Faculty Office of the Archbishop of Canterbury
16 Eastcheap, London, EC3M 1BD   tel +44 (0) 20 7623 9477
email notary@cheeswrights.com   www.cheeswrights.com
Cheeswrights LLP is a limited liability partnership registered in England and Wales under number OC426084

SCRIVENER NOTARIES

| **APOSTILLE** |
|---|
| (Convention de La Haye du 5 octobre 1961) |

| 1. | **Country:**<br>Pays / Pais: | United Kingdom of Great Britain and Northern Ireland |
|---|---|---|
| | **This public document**<br>Le présent acte public / El presente documento público | |
| 2. | **Has been signed by**<br>a été signé par<br>ha sido firmado por | Luis Neil Hyde-Vaamonde |
| 3. | **Acting in the capacity of**<br>agissant en qualité de<br>quien actúa en calidad de | Notary Public |
| 4. | **Bears the seal / stamp of**<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | The Said Notary Public |

| **Certified** |
|---|
| Attesté / Certificado |

| 5. | **at**<br>á / en | London | 6. | **the**<br>le / el día | 3 February 2026 |
|---|---|---|---|---|---|
| 7. | **by**<br>par / por | | His Majesty's Principal Secretary of State for<br>Foreign, Commonwealth and Development Affairs | | |
| 8. | **Number**<br>sous no / bajo el numero | | APO-DTC2-OPPE-NC0Q-4ZQN | | |

| 9. | **Seal / stamp**<br>Sceau / timbre<br>Sello / timbre | | 10. | **Signature**<br>Signature<br>Firma | G. Sahdev |
|---|---|---|---|---|---|

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country.

To verify this apostille go to www.verifyapostille.service.gov.uk

Award of Arbitration
Official Form



**ARBITRATION NO: 19-430**

# IN THE MATTER OF THE ARBITRATION ACT 1996

and

# IN THE MATTER OF AN ARBITRATION PURSUANT TO THE ARBITRATION RULES NO. 125 OF THE GRAIN AND FEED TRADE ASSOCIATION

BETWEEN:

**CLAIMANTS**

**LOMBARD INTERNATIONAL TRADING CORP**
UNITED STATES
(SELLERS)

-v-

**RESPONDENTS**

**TOI COMMODITIES S.A.**
SWITZERLAND
(BUYERS)

**WE THE UNDERSIGNED, HAVING BEEN APPOINTED AS ARBITRATORS, DO HEREBY FIND AND AWARD AS FOLLOWS:**

## 1.   INTRODUCTION

1.1.   This dispute concerns a claim for the price of the goods delivered by Sellers to Buyers under a contract for the sale and purchase of 31,000 metric tons +/- 10% of Soybean Meal on FOB Argentina terms. Buyers have raised counterclaims, but, for reasons explained below, those will be addressed in a separate award.

The Grain and Feed Trade Association
9 Lincoln's Inn Fields | London | WC2A 3BP | United Kingdom |
T: +44 (0) 20 7814 9666 | F: +44 (0) 20 7814 8383 | E: post@gafta.com | W: gafta.com

Registered in England & Wales with liability limited by guarantee under Company no. 1006456   VAT Registration No. GB 241 8967 24

**ARBITRATION CASE NO: 19-430**

1.2. The sale contract is subject to English law and provides for any dispute to be resolved in accordance with GAFTA Arbitration Rules No. 125. The juridical seat of this arbitration is therefore London and English law applies to all substantial and procedural matters.

1.3. As the seat of the arbitration is England and the Award is subject to English procedural and substantive laws, it follows that this is an English Award for the purpose of recognition and enforcement under the terms of the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

1.4. On 4 September 2024, Sellers claimed arbitration and invited Buyers to agree to the appointment of a Sole Arbitrator. On 13 September 2024, Buyers rejected Sellers' invitation, raised jurisdiction and time-bar defences, and appointed Mr P. Davies as arbitrator without prejudice to those defences. On 22 September 2024, Sellers appointed Ms D. Galloway as second arbitrator. On 3 June 2025, GAFTA appointed Mr E Manovil to act as the third arbitrator and Chairman of the Tribunal.

1.5. During this reference, Sellers were represented by Trowers & Hamlins LLP and by Whisenand & Turner PA. Buyers were represented by Fortior Law, Geneva.

1.6. Sellers served their Claim Submissions and accompanying documentation on 9 October 2024. Following receipt of the deposit made by Sellers on account of the fees and expenses of the arbitration, on 18 June 2025 GAFTA issued its time-table letter calling on Buyers to serve their Defence Submissions within 28 days from that date.

1.7. On 20 June 2025, Buyers submitted an application based on Sellers' alleged breach of confidentiality obligations, requesting that the Tribunal order Sellers to take certain actions, including the removal of a published article. Sellers filed their objection to this application on 1 July 2025, and Buyers served a reply on 2 July 2025. Further submissions on Buyers' application were exchanged until 9 July 2025, when the Tribunal issued the following order:

**Gafta**

**ARBITRATION CASE NO: 19-430**

*"The Tribunal has carefully considered the parties' submissions regarding Respondents' application for urgent interim relief dated 20 June 2025, which is hereby* **dismissed** *for the reasons set out below:*

*1) There is no evidence that Claimants were involved in the Globe Banner publications. We consider such evidence as necessary -despite Respondents' submissions to the contrary- for Respondents to succeed in this application.*

*2) The Tribunal's preliminary view, on the basis of the evidence currently before it, is that:*
*(a) there was a breach of confidentiality in respect of the sale contract, but such disclosure was not likely to be the cause of the alleged ongoing damages said to be suffered by Respondents; and*
*(b) the confidentiality provision in the sale contract does not apply to the Settlement Letter;*

*3) While arbitration proceedings are confidential by their nature, the Tribunal is not satisfied that any such confidentiality has been breached. In any event, the alleged conduct in the Florida proceedings does not appear to disclose material covered by this arbitration, and any overlap is, at most, incidental and immaterial; and*

*4) 'Without Prejudice' correspondence is not, in our view, subject to a duty of confidentiality, but simply protected from disclosure to the extent that it is adduced as evidence of admissions made during settlement negotiations.*

*The Tribunal's views on this interim application do not preclude any later applications based on different evidence, nor a later substantive damages claim for breach of confidentiality.*

*The Tribunal reserves its decision on the costs of Respondents' application to a later stage.*

*Considering the parties' emails of earlier today, Claimants are requested to serve their amended Claim Submissions by 16:00 hrs (London time) of 9 July 2025. The Tribunal shall then determine whether an extension of the original time-limit for the service of Respondents' Defence Submissions is granted."*

1.8.   On 10 July 2025, Sellers served their Amended Claim Submissions. On 24 July 2025, Buyers served their Defence and Counterclaim Submissions. On 18 August 2025, Buyers applied to the Tribunal for an order directing the disclosure of documents, the submission of witness and expert statements, and the fixing of an oral hearing. On 20 August 2025, Sellers served their Reply and Defence to Counterclaim Submissions. On 25 August 2025, Sellers requested that the

proceedings be bifurcated, such that their claim be decided first and Buyers' counterclaim later. Sellers also suggested that the parties then seek to agree directions on disclosure, statements and any hearing arrangements, all of which would concern Buyers' counterclaim only.

1.9. On 29 August 2025, the Tribunal issued the following order:

*"The Tribunal has considered Buyers' request for directions dated 18 August 2025, seeking disclosure of documents, the issuance of witness and expert statements, and the holding of a 3-day oral hearing. We have also considered Sellers' request dated 25 August 2025 for the proceedings to be bifurcated.*

*We agree with Sellers that their claim is distinct from Buyers' counterclaim, and that the issues arising from Sellers' claim are significantly more limited in scope. We are also mindful of Buyers' representations before the High Court to support an expedited procedure in respect of Sellers' claim. In light of the above, the Tribunal has decided to bifurcate the proceedings and hereby orders as follows:*

*1) Buyers shall serve, within 21 days from the date of this order, any rejoinder submissions they may wish to make in response to Sellers' latest submissions and documents, strictly concerning Sellers' claim. Any evidence in support, including any witness statements, must be served with the submissions. Buyers' rejoinder shall not address any issues relating to their counterclaim.*

*2) Sellers shall then serve any closing comments they may wish to make in relation to their claim, within 14 days of receipt of Buyers' rejoinder.*

*3) While the Tribunal proceeds to issue an award in respect of Sellers' claim, the parties shall use this time to seek agreement on directions for the further conduct of the proceedings regarding Buyers' counterclaim. Failing such agreement, the Tribunal will issue appropriate directions in due course."*

1.10. On 8 September 2025, Buyers objected to the bifurcation of the proceedings. On 16 September 2025, the Tribunal issued a further order pointing out that it had considered Buyers' objections in detail and found no reason to vary its earlier order dated 29 August 2025.

1.11. On 22 September 2025, Buyers served their Rejoinder Submissions. On 3 October 2025, Sellers served their Surrejoinder Submissions. On 14 October 2025, the Tribunal declared the exchange of submissions closed in respect of Sellers' claim.

5



**ARBITRATION CASE NO: 19-430**

1.12. The following narrative of the submissions summarises the arguments relevant to the arbitration. We confirm that all submissions and documents have been carefully considered, although they may not be specifically referred to in the Award.

## 2.    THE CONTRACT AND THE SETTLEMENT AGREEMENT

2.1. On 5 September 2023 Sellers agreed to sell and Buyers agreed to buy 31,000 metric tons +/- 10% of Argentine Extracted Toasted Soybean Meal, at a price of USD 528.00 per metric ton, on FOB Upriver (Argentina) terms (the "Contract").

2.2. The Contract, which was signed and stamped by both parties, contained the following terms relevant to this dispute:

*"Commodity:*
*Argentine Extracted Toasted Soybean Meal*

*(…)*

*Quantity:*
*31,000 (thirty-one thousand) metric tons, 10% more or less at vessel's option and contract price.*

*(…)*

*Price:*
*528.00 USD/MT (five hundred and twenty eight US dollars, zero cents per metric ton)*

*Parity:*
*FOB stowed/trimmed/fumigated on self-trimming bulk carrier (wing/deep tanks/tween decker's excluded) one safe port up river, one safe berth not above Timbues, excluding Villa Constitución, San Nicolas and San Pedro, Argentina, at Seller's option and to be declared upon nomination.*

*Delivery Period:*
*Spot delivery to M/V Stellar Indigo, currently at anchorage Recalada.*

*(…)*

*Payment:*

6



**ARBITRATION CASE NO: 19-430**

*100% net cash by wire transfer within 2 banking days against below listed shipping documents to Buyer's bank in Europe, which to be advised latest two banking days after completion of loading.*

*(…)*

***Confidentiality:***
*This Agreement is confidential and shall not be disclosed, except to appropriate governmental entities or to the extent that one party is required by law to disclose this Agreement, unless otherwise agreed in writing between the parties.*

***General Conditions:***
*All other terms, if not in contradiction with the above contract terms, as per GAFTA 39, latest editions, of which both parties deem to be cognizant.*
*Arbitration in London, U.K. as per G.A.F.T.A 125. Arbitration Rules, latest edition, of which both parties deem to be cognizant."*

2.3. GAFTA 39 (effective 1 January 2022), as incorporated into the Contract, contained the following provisions relevant to this dispute:

*"**11. PAYMENT***
*(…)*
*(**b) Interest**. Interest at 2.50% over the New York Prime rate shall be charged:*
*(i) if there has been a delay in any payment, computed from the first business day following the day when payment was due up to the day payment is received, both days inclusive.*
*(ii) if the bill(s) of lading are not at Sellers/Shippers' disposal at the end of the first business day following the day when bill(s) of lading are presented to vessel's agents in Buenos Aires, for any reasons beyond Sellers/Shippers' control, computed from the first working day after bill(s) of lading are presented to the agency up to the day they are released to Sellers/Shippers, both days inclusive, if Buyers' complete documentary instructions have not been timely received and presentation of documents is delayed for reasons not attributable to Sellers beyond the date of the bill(s) of lading computed from the first working day after the bill(s) of lading date up to the day documents are presented, both days inclusive. If such charge is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration. Otherwise interest shall be payable only where specifically provided in the terms of the contract or by an award of arbitration. The terms of this clause do not override the parties' contractual obligation under sub-clause (a).*

*18. DOCUMENTS BY PASS (STRING)*
*(a) In case of resales in string any party involved may propose a documents bypass whereby the first or a subsequent seller is to present documents at his own price directly to the last or a previous buyer.*
*(b) Such proposal is to be made in good time prior to commencement of loading of the nominated vessel and to contain names of sellers and buyers in the string, their individual prices and the suggested settlement of price differentials.*



**ARBITRATION CASE NO: 19-430**

*(c) All parties in the string may in their own absolute discretion refuse or agree without prejudice to their rights and obligations under their own contract, and the proposal will be declared in force only if all parties in the string have confirmed their agreement, otherwise it will bee declared failed. Agreement by each party shall include their express acceptance of the Arbitration Clause and of the Insolvency Clause. Either declaration, in force or failed, to be notified without delay to all parties involved by the party having made the original proposal.*

*(d) If no such declaration is received by the time of the vessel has started to load, the first seller may withdraw his agreement and present documents to his own buyer, or at his option charge interest at the rate stipulated in the Interest Clause for any time lost in presentation of documents.*

*(e) When a string proposal is declared in force, each party shall be deemed to have entered into a contract with all other parties in the string (who also are trading on the same terms), including express agreement by all parties to arbitration and to the application of the Insolvency Clause. It shall also be deemed to have transferred automatically from the first to the last buyers the obligation to pay for the goods and to cover insurance in accordance with the Insurance Clause. Likewise the acceptance of a string proposal by the parties other than the first seller and the last buyers shall constitute their firm commitment to pay any price differentials and other monies due.*

*(f) Should the nominated vessel for a string already in force be substituted, totally or in part, the first seller is under no obligation to commence loading the substitute vessel prior to the receipt of his own counterparty's agreement.*

*(g) Despite agreeing without prejudice to a document bypass proposal, all the parties' rights and obligations under their individual contracts, save as amended by operation of the agreed bypass, shall remain fully in force. Prior to the presentation of documents to the end buyer any party in the string may in the event in the unforeseen and serious circumstances, including the insolvency or threatened insolvency of any party in the string, withdraw agreement giving immediate notice of such withdrawal to all other parties. The documents shall then be presented through the string between individual counter-parties.*

*(h) To permit settlement of price differentials the end buyer in the string shall without delay confirm receipt of shipping documents and the exact quality shipped to all parties involved, and price differentials as agreed shall then be paid within 48 hours from receipt of the relevant debit note. Carrying charges and/or quality allowances, if due, shall be settled between individual counter-parties. Interest shall be charged in the event of late payment of any invoice or debit note.*

*(i) All Sellers and Buyers under contracts containing the Documents By-Pass Clause shall be deemed to have entered into mutual agreements with one another to the above effect, and to agree to submit to arbitration all questions and claims between them or any of them in regard to the execution of this clause in accordance with the Arbitration Clause of this contract.*

**24. DOMICILE.** *This contract shall be deemed to have been made in England and to be performed in England, notwithstanding any contrary provision, and this contract shall be construed and take effect in accordance with the laws of England. (…)"*

2.4.    On 1 November 2024, the parties signed and stamped a "Settlement Letter" pursuant to which Buyers agreed to pay Sellers: (i) the sum of USD 17,533,356.66, within sixty days from that date; and (ii) interest in the amount of USD 1,928,699.23,

**ARBITRATION CASE NO: 19-430**

plus USD 5,956.54 per day from 5 August 2024 until the date of payment, within ninety days from 1 November 2025. The Settlement Letter provided that, upon receipt of those funds by Sellers, these GAFTA proceedings would be withdrawn and all Sellers' claims would be fully and finally settled.

2.5.   On 18 December 2024, the parties agreed to amend the Settlement Letter, extending the time for payment of the principal amount to 15 January 2025 and that of the interest amount to 31 January 2025.

2.6.   The Settlement Letter dated 1 November 2024 and the Amendment to the Settlement Letter dated 18 December 2024 shall jointly be referred to as the "Settlement Agreement."

## 3.   THE RELEVANT FACTS

3.1   On 13 September 2023, Sellers delivered 33,387.00 metric tons of soybean meal under the Contract on board *MV Stellar Indigo* (the "Vessel").

3.2   On 19 September 2023, Sellers requested Buyers to provide their bank's details for the purpose of presenting documents. Sellers repeated this request on 10 October 2023.

3.3   On 17 October 2023, Buyers instructed Sellers to send the shipping documents to their own address in Geneva. Sellers sent the documents to such Buyers' address on 19 October 2023. Buyers never paid for the documents.

3.4   On 15 April 2024, Buyers sent a message to Sellers and to Buyers' Irani buyers, Tose Tejarat Khavarmianeh Armani ("Armani"), formally assigning their right to receive payment from Armani to Sellers.

3.5   On 23 April 2024, Armani acknowledged receipt of the "Payment Assignment Letter" and informed that, upon receiving currency allocation approval from the Ministry of Agriculture and the Central Bank of their country, they would proceed to pay Sellers —after agreeing an FX rate with them.

**ARBITRATION CASE NO: 19-430**

3.6 On 5 August 2024, Sellers sent a "Final Demand for Payment" letter to Buyers, warning them that, if payment of the total sum of USD 19,070,912 was not received by 15 August 2024, Sellers would initiate legal proceedings.

3.7 On 15 August 2024, Buyers rejected Sellers' letter on the ground that payment of the price had been assigned to Armani. Buyers stated that Sellers had agreed to this assignment in April 2024 and considered it revealing that Sellers had not sought any payment from Buyers since then.

3.8 Later the same day, Sellers expressed their willingness to settle the matter amicably by giving Buyers or Armani time to pay the sums due until 14 September 2024, provided Buyers signed a letter acknowledging the existence of the debt. Buyers did not sign the letter.

3.9 On 28 August 2024, Sellers informed Buyers that they had filed a requisition for debt enforcement in Geneva.

3.10 On 4 September 2024, Sellers served their GAFTA arbitration notice on Buyers.

3.11 On 13 September 2024, in the same letter by which Buyers rejected Sellers' invitation to appoint a sole arbitrator and proceeded instead to appoint Mr. P. Davies as their party-appointed arbitrator in a tribunal of three, Buyers stated the following: (i) that any tribunal appointed would lack jurisdiction as a result of the assignment agreement allegedly concluded in April 2024; (ii) that Sellers' claim was in any event time-barred; and (iii) that Sellers had breached the arbitration agreement by commencing parallel enforcement proceedings in Switzerland —entitling Buyers, so they contended, to claim damages for that breach.

3.12 On 22 September 2024, Sellers rejected Buyers' letter and appointed Ms D Galloway as second arbitrator.

**ARBITRATION CASE NO: 19-430**

3.13    On 1 November 2024, after Sellers had already served their Claim Submissions dated 7 October 2024, the parties signed and stamped the Settlement Letter referred to at paragraph 2.4 above.

3.14    On 18 December 2024, the parties concluded the Addendum to the Settlement Letter mentioned at paragraph 2.5 above.

3.15    On 21 May 2025, Sellers' US solicitors sent a letter to Buyers demanding payment of the sums agreed in the Settlement Agreement no later than 10:00 hrs Miami time of 23 May 2025.

3.16    On 22 May 2025, Armani completed payment of the price due to Buyers under the resale of the same goods that had been delivered by Sellers under the Contract.

3.17    On 23 May 2025, Sellers' US solicitors served a new letter asserting that Buyers were guilty of civil theft and indicating that Sellers would pursue: (i) the existing Swiss Court debt/bankruptcy proceeding against Buyers in Geneva; (ii) the existing GAFTA proceedings against Buyers in London; and (iii) a Miami Court proceeding against Buyers for civil theft of the principal and interest.

3.18    On 26, 27 and 29 May 2025, the parties met at Sellers' offices in Miami (the "Miami Meetings"). Buyers contend that, during these meetings, the parties reached an agreement that varied and superseded the 2024 Settlement Agreement. Sellers deny that any such agreement was concluded.

3.19    On 28 May 2025, Sellers attached contract terms and a proforma invoice to an email in which they referred to these documents and requested Buyers to confirm a payment date. The email stated: "*Please find attached the purchase contract and the corresponding proforma invoice for the soyabean meal operation. Could you please confirm the payment value date? Looking forward to your reply*"

3.20    The contract terms attached to Sellers' email of 28 May 2025 provided for the FOB sale and purchase of 80,000 metric tons +/-10% of Argentine soybean meal, with a

**Gafta**

delivery period of 15 July – 30 August 2025, at a price of USD 313.10 and with a 70% prepayment requirement. The accompanying proforma invoice referred to that contract and specified a 70% advance payment in the amount of USD 17,533,600.00. Buyers contend that these documents reflected a concluded agreement between the parties. Sellers, by contrast, maintain that they were merely drafts sent during without prejudice negotiations which did not result in an agreement.

3.21   Later on 28 May 2025, Buyers acknowledged receipt of the two documents and stated that their treasury department would "*revert with updates on the payment/VD in due course.*"

3.22   On 29 May 2025, Sellers' US solicitors served a 30-day notice of civil theft on Buyers, pursuant to Florida Statute §772.11.

3.23   On 11 June 2025, an article entitled "*Lombard Trading demands $17.5M from TOI Commodities over 33,000 ton soybean meal deal, threatens $52M theft lawsuit*" was published in *Globe Banner Reports* (the "First Globe Banner Article").

3.24   On 14 June 2025, an article entitled *"Lombard Trading Accuses Swiss Firm Of$52M Civil Theft Over Soybean Meal Deal"* was published in the EU Business Daily (the "EU Business Daily Article").

3.25   On 20 June 2025, the English High Court issued an order restraining Sellers from commencing, continuing, or taking any step against Buyers in proceedings in any court or tribunal in Florida, USA —or any jurisdiction other than GAFTA arbitration in London— in respect of any dispute arising out of or in connection with the Contract and/or the Settlement Agreement. The order was endorsed with a Penal Notice, warning that failure to comply could result in contempt of court.

3.26   On 25 June 2025, an article entitled "*Trans-Oil grain tycoon Jhashi faces civil theft claim amid oligarch ties and monopoly accusations*" was published by *Globe Banner Reports* (the "Second Globe Banner Article").



3.27   The articles published by *Globe Banner Reports* on 11 and 25 June 2025 shall jointly be referred to as the "Globe Banner Articles".

## 4.   SUBMISSIONS

### Sellers' Claim Submissions

4.1   Sellers originally based their claim on Buyers' alleged failure to pay the price due under the Contract. However, they subsequently modified their position and served amended submissions claiming the sums allegedly due under the terms of the Settlement Agreement, which was concluded after the service of Sellers' original Claim Submissions.

4.2   Sellers pointed out that, under the terms of the Settlement Agreement, Buyers irrevocably undertook to pay the sum of USD 17,533,356.66 —equivalent to the Contract price— (the "Principal Amount"), together with USD 1,928,669.23 plus USD 5,956.54 per day from 1 November 2024 onwards (together, the "Interest Amount"). Sellers asserted that Buyers failed to pay any of these amounts, within the time limits set in the Settlement Agreement, or at all.

4.3   Sellers stated that the Settlement Agreement is covered by the arbitration clause in the Contract and that, accordingly, the Tribunal has jurisdiction to award the sums claimed following Buyers' breach of the Settlement Agreement.

4.4   Alternatively —should the Tribunal decide that there is no payment obligation under the Settlement Agreement—, Sellers maintained their claim for payment of the price due from Buyers under the Contract, together with interest pursuant to the interest clause in GAFTA 39.

4.5   Sellers denied having concluded any assignment or novation agreement. Sellers also contended that, the goods under the Contract having been shipped on 13 September 2023, the arbitration notice dated 4 September 2024 was served within the one-year time limit set out in Rule 2.2(b) of the GAFTA Arbitration Rules No.125.

**Ga∫ta**

## Buyers' Defence Submissions

4.6     Buyers admitted that Sellers delivered the purchased cargo but denied being liable under the Contract. Buyers stated that the Contract was concluded for the purpose of formalising a prior oral arrangement whereby the goods would be shipped to Iran and the profits from Buyers' onward sale to Armani would be shared between the parties. According to Buyers, their share of the profit was agreed to be realised by their insertion as intermediary in the contractual chain between Sellers and Armani. Buyers averred that Sellers shipped the goods, which were ultimately delivered to Armani, but Armani failed to pay, giving rise to a dispute between the parties regarding the appropriate allocation of loss arising from Armani's breach. Buyers asserted that this dispute was settled by an agreement reached in April 2024, which allegedly removed them from the contractual framework, thereby enabling Sellers to pursue Armani directly for recovery of the unpaid price of the goods. Buyers highlighted that, when they formally assigned the receivable to Sellers and Armani confirmed the assignment, Sellers raised no objection.

4.7     Buyers submitted that, in any event, the position under the Contract is rendered irrelevant by the Settlement Agreement dated 1 November 2024 (as amended on 18 December 2024). While admitting that they had agreed to pay the amounts within the deadlines stipulated in the Settlement Agreement, Buyers referred to the Miami Meetings held on 26, 27 and 29 May 2025, during which the parties allegedly agreed to vary the terms of the Settlement Agreement and/or enter into a new agreement, under which: (i) Sellers would be compensated for their losses —namely, USD 17,533,600.00— through increased trading margins on future contracts to be concluded with Buyers; (ii) Buyers would pay the same amount to Sellers, to be held both as security and as prepayment under a new contract dated 28 May 2025 (the "28 May 2025 Contract"); and (iii) the prepayment would be retained by Sellers until their losses had been fully recovered through the increased trading margins, after which the balance would either be returned to Buyers or applied towards the payment of a commodity shipment under the 28 May 2025 Contract.

**ARBITRATION CASE NO: 19-430**

4.8     Buyers stated that they have no liability under the Settlement Agreement, as it was allegedly superseded by the parties' new agreement, and specifically by the 28 May 2025 Contract. Buyers added that, while disputes under this new contract would ordinarily be referred to a separate GAFTA arbitration, they are content for the present Tribunal to determine such claim, provided the Tribunal and Sellers agree. Buyers explained that, in purported compliance with the 28 May 2025 Contract, they instructed their bank on 12 June 2025 to process the agreed payment to Sellers. However, the payment was not executed by the bank, which Buyers attributed to Sellers' own breach of both the Contract and the Settlement Agreement — specifically, Sellers' role in causing the publication of the Globe Banner Article. Buyers submitted that, in light of that breach, they should not be held liable for any resulting non-performance. Alternatively, they argued that no interest should accrue from the date of Sellers' breach.

4.9     Buyers contended that Sellers suffered no actual loss as a result of Buyers' failure to pay under the 28 May 2025 Contract, since the payment in question was to be held merely as security until Sellers had generated sufficient increased trading margins to cover their losses. According to Buyers, this meant that, at most, Sellers lost the benefit of a security interest —not a direct monetary loss. Buyers further emphasised that they are a creditworthy entity, with a turnover in the hundreds of millions of dollars, and that they would comply with any payment order ultimately issued. Accordingly, they argued, the absence of security did not translate into a compensable loss. Buyers also submitted that, in any event, it was for Sellers to plead and prove their loss, which —according to Buyers— Sellers have failed to do.

4.10    Buyers asserted that, if Sellers suffered any loss, it was not due to Buyers' failure to make payment under the 28 May 2025 Contract, but rather due to Sellers not receiving the increased trading margins allegedly agreed during the Miami Meetings. Buyers submitted that any such loss was self-inflicted by Sellers, who chose to accuse Buyers of theft instead of concluding the new trading deals with them. Buyers stated that they are therefore not liable for any resulting loss. Further

or alternatively, Buyers submitted that the contracts through which Sellers' losses were to be compensated had to be concluded and/or performed within a reasonable period, and that, as at the date of service of their Defence Submissions, such period had not yet expired. On that basis, Buyers argued that Sellers' claim was, in any event, premature.

4.11    Buyers further argued that, even if their primary defences were unsuccessful, they would be entitled to an equitable set-off in respect of the losses allegedly suffered as a result of Sellers' purported breaches of confidentiality and of the arbitration clause.

4.12    The Tribunal has ordered bifurcation, with Buyers' counterclaim to be addressed in a separate award, but Buyers' defence by way of equitable set off is relevant to this award, so we summarise below the arguments made by way of an alternative defence to Sellers' claim.

4.13    Buyers stated that their claims against Sellers for breach of confidentiality and breach of the arbitration agreement arise under the Contract and the Settlement Agreement, and therefore refer to the same or closely related transactions as Sellers' claim under the Settlement Agreement. Buyers asserted that, in their estimation, the damages sought would be for sums due and payable exceeding the amount claimed by Sellers, or at least representing a substantial proportion of it. On that basis, Buyers argued that it would be manifestly unjust for Sellers' claim to proceed without due consideration of their counterclaims.

4.14    Buyers also made their claims by way of counterclaim, but we do not recite these submissions here as a result of the bifurcation.

4.15    Buyers requested the Tribunal to find and award that: (i) the Settlement Agreement was superseded by a new agreement reached during the Miami Meetings and reflected in the 28 May 2025 Contract; (ii) Sellers therefore have no enforceable claim under the Settlement Agreement; (iii) any claim advanced by Sellers arises, if at all, under the 28 May 2025 Contract; (iv) Sellers suffered no recoverable loss

under that contract, as the alleged prepayment was to be held as security only, and the transactions expected to generate compensation were either not concluded due to Sellers' own conduct or remain within the reasonable time for performance; (v) Buyers' counterclaim be fully or partially set off against Sellers' claim and (vi) no interest is payable by Buyers from 12 June 2025 onwards, as Sellers would have received payment on that date but for their breach of confidentiality.

## Sellers' Reply Submissions

4.16   Sellers noted Buyers' admission that, under the Settlement Agreement dated 1 November 2024 (as amended on 18 December 2024), they undertook an irrevocable obligation to pay Sellers the sums claimed in this arbitration.

4.17   Sellers rejected Buyers' contention that the Settlement Agreement was replaced by an oral agreement made during the Miami Meetings. Sellers denied having reached any agreement and argued that, if they had been minded to do something as drastic as accepting that Buyers would not pay over USD 20 million they owed outright, in return for some vague and unspecified increased trading margins on future trading contracts between the parties, Sellers would have insisted on a written, signed agreement —as they had done with the Settlement Agreement.

4.18   Sellers stressed that all Buyers have cited is a miscellaneous draft contract for a separate deal and a draft prepayment invoice. According to Sellers, the draft documents never took effect, were never finalised and are therefore irrelevant.

4.19   Sellers submitted that the agreement alleged by Buyers would have resulted in a commercially incoherent arrangement, under which the parties would have entered into a sham contract and Sellers would, at some undefined point and under as-yet-unknown future transactions, recover less than the amount already owed by Buyers under the existing Settlement Agreement. Failing such recovery, the sham contract would somehow convert into an enforceable agreement —at an unspecified time and subject to further agreement. Sellers also noted that Buyers had never previously asserted the existence of this alleged oral agreement —which is said to

**Gafta**

**ARBITRATION CASE NO: 19-430**

have superseded a written and signed Settlement Agreement— until the service of their Defence Submissions in these proceedings, which Sellers considered telling.

4.20   Sellers concluded that the Miami Meetings formed part of without prejudice discussions and did not amend or supersede the Settlement Agreement, which continues to govern Buyers' payment obligations. Accordingly, Sellers requested that the Tribunal issue a declaration to that effect, and order that Buyers pay the Principal Amount and the updated Interest Amount —as set out in the Settlement Agreement—, together with the costs of this arbitration.

4.21   In relation to the defence of equitable set off, Sellers stated that Buyers were seeking to convert a counterclaim into a defence by way of a single paragraph, without citing any supporting legal authority. Sellers argued that equitable set off lies within the Tribunal's discretion and may only be allowed where it is just and equitable in all the circumstances to hold that a counterclaim serve as a defence to the claim. Sellers contended that it is trite law that a set-off must either relate to a debt that is due and payable, or involve an unliquidated claim that is reasonably capable of assessment. Here, according to Sellers, Buyers had neither: the alleged damages were unproven and unliquidated, and thus incapable of constituting a valid set-off. Accordingly, Sellers maintained that it would not be just to allow what is effectively a counterclaim to operate as a defence to their claim for the price.

### Buyers' Rejoinder Submissions

4.22   Buyers made certain reservations and objections in relation to bifurcation.

4.23   Buyers maintained that the Settlement Agreement was superseded by new agreements reached during the Miami Meetings. Buyers recalled that Armani paid the purchase price to them in several instalments, the latest being credited in their account on 22 May 2025. Buyers added that they immediately informed Sellers that arrangements were being made to pay the Principal Amount. Buyers clarified that Armani never paid any interest.

4.24   Buyers exhibited a statement from Mr Vitalie Butnaru (an advisor to Buyers' Chairman) who was present at the Miami meetings. This statement was filed in support of a court application for injunctive relief in relation to the threatened Miami proceedings (see paragraph 3.17 above) but was reused by Buyers for the purposes of this reference. In the statement, Mr Butnaru states that the Miami meetings were held to discuss payment of the debt to Sellers, as well as future business. The Tribunal noted that Mr Butnaru describes the 28 May 2025 Contract as a "draft contract" and says that the parties "subsequently" set -off Buyers' debt to Sellers, but does not explain the mechanics of how / when this was agreed.

4.25   Buyers also explained that, because the funds had originated from Iran and Sellers' designated account was in the United States, payment could not be made directly from the account into which Armani had deposited the funds. According to Buyers, they sought alternative payment arrangements and, while Sellers' US solicitors issued repeated demands for immediate payment and threatened Buyers will legal proceedings, without prejudice settlement discussions were held with Sellers during the Miami Meetings to discuss both future business and the mechanics of payment of the debt to Sellers.

4.26   Buyers clarified that they were not relying in these proceedings upon the content of the Miami meetings, which were only referred to as context of the written 28 May 2025 Contract. Buyers stressed that it was Sellers who prepared and circulated the 28 May 2025 Contract, together with an invoice for USD 17,553,600 —an amount equivalent to that due under the Settlement Agreement, save for a minor discrepancy of USD 30. Buyers insisted that the parties agreed that the debt under the original Contract would be set off, and that the 28 May 2025 Contract would supersede both the original Contract and the Settlement Agreement. Buyers highlighted that the document was a detailed written contract issued by Sellers themselves, bearing a contract number and date, identifying the parties, commodity, quantity, price, delivery window, GAFTA incorporation, and full terms of performance, and that it was not marked "*draft*" or accompanied by an indication

that it was provisional or "*for discussion only*". Buyers asserted that the agreement contained all essential terms and was sufficiently specific to constitute a binding contract under English law.

4.27   Buyers stated that the messages exchanged between Mr Garbuglia of Sellers and Mr Munteanu of Buyers on 28 May 2025 confirm that an agreement had been reached. Buyers argued that, when Mr Garbuglia attached the contract and proforma invoice to an email where he requested "*the payment value date*", and Mr Munteanu acknowledged receipt of the documents and replied that "*our treasury will get back to you with updated on the payment/VD in due course*", they were clearly not referring to any drafts but to a concluded agreement. Buyers asserted that they then acted in accordance with that contract by submitting a payment order to their bank in respect of the invoice dated 28 May 2025.

4.28   Buyers submitted that, in circumstances where the 28 May 2025 Contract was prepared by Sellers, accepted by Buyers, acted upon, and contained all the elements of a binding contract, it is incorrect for Sellers to dismiss it or call it a "*sham contract*".

4.29   Buyers averred that, while payment of interest had been scheduled for 31 January 2025 under the Settlement Agreement, this was varied by the agreement allegedly reached in late May 2025. Buyers stated that, pursuant to that agreement, they were to provide Sellers with security under the 28 May 2025 Contract and corresponding invoice, with Sellers' losses being compensated from increased margins on future trades. Buyers affirmed that the contractual framework for payment of interest under the Settlement Agreement was therefore displaced.

4.30   Buyers repeated that they fulfilled their obligations under the 28 May 2025 Contract by issuing a payment order on 12 June 2025 for the invoiced prepayment. Buyers argued that this payment would have discharged any obligation to Sellers, including in respect of accrued interest, but for the intervention of Buyers' bank in placing the transfer on hold. Buyers asserted that this intervention was the result of Sellers' own

conduct in causing the publication of confidential materials and allegations in the Globe Banner Articles, which prompted the bank's compliance concerns. Buyers contended that, even if interest were recoverable —contrary to their main submission that any claim to interest under the Settlement Agreement fell away because the governing agreement was the 28 May 2025 Contract—, no interest would be payable from 12 June 2025 onwards, as payment would have been made on that date had Sellers not committed their alleged breach.

4.31   Buyers submitted that, as their previous offer to consent to the Tribunal's jurisdiction in respect of the 28 May 2025 Contract was not accepted, the Tribunal lacks jurisdiction over that contract. Buyers added that, as the original Contract and the Settlement Agreement were both superseded by the 28 May Contract, the Tribunal has no jurisdiction to determine the present dispute at all.

**Sellers' Surrejoinder Submissions**

4.32   Sellers maintained that the 28 May 2025 Contract was merely a draft. Sellers pointed out that this is how Buyers' own witness, Mr Butnaru, described the document at paragraph 25 of his statement dated 20 June 2025 (see paragraph 4.23 above).

4.33   Sellers contended that, even if the 28 May 2025 document were a binding contract, it would still not have replaced the Settlement Agreement. Sellers stated that the document provided for a fresh transaction, i.e. a future shipment of soybean meal in return for payment, with no indication whatsoever of the arrangements that Buyers said were agreed. Sellers specified that there was nothing in the 28 May 2025 Contract suggesting that Sellers' obligation to deliver the soybean meal was a fiction, that instead a prepayment of USD 17,533,600 would be held by Sellers as security in respect of increased margins on future trades, or that this obligation to pay security displaced Buyers' irrevocable and binding obligation under the Settlement Agreement to pay Sellers outright with no conditions.

4.34   Sellers argued that the only conceivable way in which the 28 May 2025 Contract could have included these alleged terms is if they had been agreed upon verbally at the Miami Meetings. Sellers denied any such agreement and referred to Buyers' own contention that they were not relying on the contents of those meetings but merely referring to them as the context in which the subsequent written agreement was prepared.

4.35   As to the exchanges between Mr Garbuglia from Sellers and Mr Muteanu from Buyers in the evening of 28 May 2025, Sellers highlighted that there was no reference at all to the parties agreeing that there would be no new soybean meal delivery, that the prospective payment was to be merely a security, or that the binding and signed Settlement Agreement would be rendered moot —even if payment was not made.

4.36   Sellers admitted that the parties held without prejudice discussions, and that the 28 May 2025 Contract was sent by them to Buyers in the course of those discussions. However, Sellers denied having agreed that this draft contract would supersede the Settlement Agreement, or that they would hold any payment received from Buyers merely as security. Sellers added that the non-written terms of the 28 May 2025 draft that Buyers allege are wholly implausible, considering that the parties had been in dispute for the better part of two years and had twice reached signed and binding settlements that obliged Buyers to pay outright. According to Sellers, no rational businessperson in their shoes would then suddenly throw away that right by entering into a contract where it would hold the resulting payment merely as security in respect of margins on unspecified future deals, let alone without receiving payment under the alleged new contract first and without putting the displacement of the Settlement Agreement in writing.

4.37   Sellers rejected Buyers' submission that any claim for interest under the Settlement Agreement was displaced by the alleged agreement reached in late May 2025. Sellers also contested Buyers' alternative submission that no interest should be payable from 12 June 2025 due to the publication of the Globe Banner Article.

Gafta

Sellers contended that this would be wrong even if they had been responsible for that publication. Sellers stated, however, that they would be content for the Tribunal to reserve jurisdiction on contractual interest under the Settlement Agreement from 12 June 2025 onwards until it has determined Buyers' counterclaim in relation to the Globe Banner Article.

4.38 As to Buyers' contention that the Tribunal lacks jurisdiction to resolve the present dispute —because the parties never agreed that the Tribunal should have jurisdiction over the 28 May 2025 Contract—, Sellers stated that: (i) the 28 May 2025 Contract was a draft and not a binding contract; (ii) even if it were, it did not displace the Contract and Settlement Agreement, under which the present dispute arose; and (iii) pursuant to the principle set out in the *Fiona Trust* judgment, the Tribunal would have jurisdiction over a dispute arising under the 28 May 2025 Contract in any event.

4.39 In response to Buyers' complaint that they were not permitted to advance their defence of equitable set-off due to the bifurcation of proceedings, Sellers pointed out that this defence was in fact raised by Buyers in their Defence and Counterclaim Submissions and was addressed by Sellers in their Reply and Defence to Counterclaim Submissions —where Sellers explained why equitable set-off between their claim and Buyers' counterclaim should not be available. Sellers noted that both parties' positions on equitable set-off were therefore already before the Tribunal, and had been considered by the Tribunal, when the bifurcation order was made on 29 August 2025. Sellers argued that, if Buyers now contend they were unable to properly present their set-off defence, their complaint is, in substance, that they failed to plead it adequately in their own Defence and Counterclaim Submissions. Notwithstanding this, Sellers requested that the Tribunal include in its award the reasons for its finding that the defence of equitable set-off is not available in these proceedings.

5.   **FINDINGS**

Ga**f**ta

5.1    The issues for us to decide are:

(i) Whether the Settlement Agreement was amended or superseded by the agreements Buyers allege were reached during the Miami meetings;

(ii) If so, whether the Tribunal has jurisdiction to determine matters arising under such agreements;

(iii) If not, whether Buyers' defence of equitable set off is available to them in the circumstances of this case;

(iv) Whether Sellers entitled to an award for amounts due but unpaid under the Settlement Agreement;

(v) What interest is due, if any; and

(vi) Costs.

5.2    We considered first Buyers' defence that the Settlement Agreement (under which payment was due from Buyers to Sellers latest 15 January 2025) was superseded by agreements reached at the Miami meetings and by the 28 May 2025 Contract.

5.3    It is common ground between the parties that the Maimi meetings were held to discuss settlement / the mechanics of payment of the debt to Sellers. Buyers also stated that the meetings were to discuss "future business".

5.4    Buyers relied on the 28 May Contract and on Sellers' proforma invoice. They submitted that the parties agreed to set off the debt arising under the Settlement Agreement against the payment allegedly due under the 28 May Contract. However, Buyers also expressly stated in submissions that they did not rely on the *content* of the Miami meetings as part of their case. Rather, they referred to those meetings solely as background context in which the 28 May 2025 Contract was entered into.

5.5    The issues in relation to the 28 May 2025 Contract are as follows:

**G**a**ft**a

(i) Was it a draft or a concluded agreement?

(ii) If it was a concluded agreement, did it have the effect of superseding the Settlement Agreement?

5.6    We address the second point first, as we consider the position to be entirely clear. On the evidence before us, there is no link between the Settlement Agreement and the 28 May 2025 Contract. The 28 May 2025 Contract contains no reference to the existing debt or to the Settlement Agreement. It is framed as a standalone new transaction between the parties with an advance payment provision. While Buyers asserted in their Defence Submissions that various matters had been agreed between the parties (see 4.7 above), the 28 May 2025 Contract makes no mention of profit margins, security, or any obligation to return the pre-payment. In their Rejoinder Submissions, Buyers stated that they did not rely on the content of the Miami meetings, but solely on the 28 May 2025 Contract. The difficulty for Buyers is that the 28 May 2025 Contract is silent on all of the elements they seek to ascribe to it and cannot, on its face, be construed as incorporating those terms.

5.7    As a result, **WE FIND THAT** the Settlement Agreement remains in full force and effect and has not been superseded by the 28 May 2025 Contract. It follows, **AND WE SO FIND,** that the Tribunal has jurisdiction to determine the claims made by Sellers pursuant to the Settlement Agreement, as both parties accepted that the Settlement Agreement was within the scope of the arbitration clause of the Contract.

5.8    We then reviewed the evidence relating to the draft / concluded agreement point, although strictly this no longer arises given our finding above. We looked in particular at: (i) the emails sending and acknowledging the 28 May 2025 Contract; and (ii) the statement of Mr Vitalie Butnaru. We also noted that the 28 May 2025 Contract was sent on that day, while it is common ground that the settlement / new business meetings continued the following day. On balance, we think it likely that the 28 May 2025 Contract was a discussion draft, and **SO WE FIND.**

25

**Ga** *f* **ta**

**ARBITRATION CASE NO: 19-430**

5.9   We turn next to the issue of equitable set off. In their submissions, both parties appeared to accept that the applicable test is twofold: (i) the cross-claim must arise out of the same transaction or a closely related one; and (ii) it must be manifestly unjust to allow the main claim to proceed without taking the cross-claim into account.

5.10   Sellers added that, for equitable set-off to apply, the counterclaim must either be due and payable or subject to a reasonable estimate. Buyers did not expressly dispute this formulation and, in their submissions, stated that their claims were due and payable and that, in their reasonable estimation, the amounts claimed would exceed Sellers' claim.

5.11   For the purpose of determining the issue of equitable set-off, we have proceeded on the assumption that Buyers' claims for breach of confidentiality under the Contract and Settlement Agreement, and/or for breach of the arbitration agreement, will succeed. However, these claims are presently wholly unliquidated, and Buyers have made no attempt to quantify them or provide even a reasonable estimate.

5.12   We have also assumed, for the same purpose, that Buyers' claims arise out of the same or closely related transactions as those forming the basis of Sellers' claims under the Settlement Agreement.

5.13   The remaining question is whether it would be unjust to permit Sellers' claim to proceed without taking Buyers' counterclaims into account by way of equitable set-off. Our conclusion is that it would not be unjust. We reach this conclusion because:

(i) Sellers' claims under both the Contract and the Settlement Agreement are for fixed sums, and constitute debts rather than damages;

(ii) those debts accrued significantly before the events giving rise to Buyers' counterclaims;

(iii) Buyers' counterclaims are wholly unliquidated and will require, in our view, substantial evidence and analysis before any reliable assessment of *quantum* can be made;

(iv) Buyers have offered no explanation or reasoning in support of their bare assertion that their claims will exceed, or significantly reduce, Sellers' claims;

(v) Buyers' counterclaims can and will be resolved separately, and we have no reason to believe that Sellers would not comply with any award made against them due course.

5.14   For the above reasons, **WE FIND THAT** Buyers' defence of equitable set-off fails.

5.15   Based upon all of our findings above, **WE FIND THAT** Sellers' claim for payment of the Settlement Agreement sums succeed in full and that Buyers shall therefore pay USD 17,533,356.66 to Sellers forthwith.

5.16   The Settlement Agreement provided for the above principal sum to carry interest and specified that USD 1,928,669.23 had accrued as at 5 August 2024 and continued to accrue at USD 5,956.54 per day thereafter. However, Buyers have claimed such daily interest from 1 November 2024, being the date of the Settlement Letter. Accordingly, **WE FIND THAT** Buyers are entitled to interest in the sum of USD 1,928,669.23, plus USD 5,956.54 per diem from 1 November 2024 until the date of this award, totalling USD 4,406,589.87.

5.17   The amounts payable to Sellers pursuant to paragraphs 5.15 and 5.16 above shall carry interest at the rate of 5% per annum, compounded quarterly, from the date of this award until the date of payment.

5.18   The general rule is that costs follow the event. As Sellers' claim has succeeded in full, the fees and expenses of this arbitration shall be borne by Buyers, **AND SO WE FIND**.

5.19   We reserve jurisdiction to deal with Buyers' counterclaims.

27

**Gafta**

**ARBITRATION CASE NO: 19-430**

## 6.   AWARD

6.1   **WE AWARD THAT** Buyers shall forthwith pay to Sellers USD 17,533,356.66 (United States Dollars seventeen million five hundred and thirty-three thousand three hundred and fifty-six with sixty-six cents).

6.2   **WE FURTHER AWARD THAT** Buyers shall forthwith pay to Sellers the sum of USD 4,406,589.87 (United States Dollars four million four hundred and six thousand five hundred and eighty-nine with eighty seven cents).

6.3   **WE FURTHER AWARD THAT** Buyers shall pay interest to Sellers on the sums awarded in paragraphs 6.1 and 6.2 above, at the rate of 5% per annum, compounded quarterly, from the date of this award until the date of payment.

6.4   **WE FURTHER AWARD THAT** all fees and expenses of the arbitration, as per the attached statement, are to be paid by Buyers.

6.5   **WE RESERVE** jurisdiction to deal with Buyers' counterclaims.

6.6   Any non-member fee shall remain to be paid for by the non-member party.

6.7   We hereby reserve jurisdiction to make any further award or awards on any issues arising in respect of any administrative or other formalities in relation to the preparation and signing of this Award.

**ARBITRATORS**

D. Galloway

P. Davies

Signed by :   E. Manovil

(Chairman)

28



**ARBITRATION CASE NO: 19-430**

## ARBITRATION FEES AND EXPENSES

The Fees and Expenses of this Arbitration are as under:-

|  | £ |
|---|---|
| Association's Fees | 1,720.00 |
| Non-Members Charge | 3,400.00 |
| Arbitrators' Fees | 33,300.00 |
| VAT | 0.00 |
| £ | 38,420.00 |

£36,720.00 is to be paid by Buyers (fees costs and expenses of this Award plus non-members charge)

£1,700.00 is to be paid by Sellers (non-members charge)

*In the event of an Appeal being lodged against this Award, Appeal fee for Members and Non-Members shall be: £20,000.00*

GAFTA's VAT Identification No: GB 243 8967 24

Sellers' VAT Identification No:

Buyers' VAT Identification No: